## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

DOROTHY WITHERSPOON,            :

     Plaintiff,                :

vs.                             :           CA 12-0220-C

CAROLYN W. COLVIN,              :
Acting Commissioner of Social Security,[1]
                                :

     Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 19 & 20 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.").) Upon consideration of the administrative record, plaintiff's brief, the Commissioner's brief, and the arguments of the parties at the February 15, 2013 hearing before the

---

[1]    Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Colvin is substituted for Michael J. Astrue as the proper defendant in this case.

Court, it is determined that the Commissioner's decision denying plaintiff benefits should be affirmed.[2]

Plaintiff alleges disability due to diabetes mellitus, hypertension, left ankle injury, obesity, degenerative joint disease of the knees, and depression. The Administrative Law Judge (ALJ) made the following relevant findings:

> **1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2014 (Exhibit 4D).**
>
> **2.      The claimant has not engaged in substantial gainful activity since February 2, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**
>
> The claimant's earnings record shows that in the second quarter of 2010, she received $1,434 from her former employer, New Era Cap Company. The claimant's medical records indicate that she was on medical leave from this job from February to April 2010 due to a left ankle injury. According to the claimant's testimony, she had problems related to this injury after she returned to work. Shortly thereafter, she was laid off because the plant was closing down, and her position was eliminated. On the basis of this evidence, the undersigned concludes that the claimant's limited work activity after the alleged disability onset date did not rise to the level of substantial gainful activity.
>
> **3.      The claimant has the following severe impairments: diabetes mellitus; hypertension; history of left ankle sprain and plantar fasciitis; obesity; and degenerative joint disease of the knees (20 CFR 404.1520(c) and 416.920(c)).**
>
> The claimant's treatment records from her primary care physician, Dr. Ronnie Chu, document a history of diabetes, hypertension, and obesity. There are indications that her diabetes and hypertension have been uncontrolled at times, but it also appears that she has not consistently complied with her prescribed treatment regimen. . . .
>
> The medical evidence of record shows that on January 27, 2010, the claimant tripped on some steps at work and injured her left ankle. Her

---

[2]      Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 19 & 20 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

employer referred her to Dr. Keith Dismukes, who examined the claimant on February 3, 2010, noting that the x-ray of her left foot and ankle showed no fracture and there was minimal, if any, swelling on examination. Dr. Dismukes diagnosed a left ankle sprain and prescribed an air cast and crutches, advising the claimant to remain off work for the present.

Dr. Dismukes referred the claimant to Dr. Stephen Ikard at the University Orthopedic Clinic in Tuscaloosa. Dr. Ikard examined the claimant on February 10, 2010, noting that there was no swelling or limitation in the range of motion of the claimant's left foot or ankle, but she was still experiencing pain with weight bearing. The claimant returned on February 17 and 24, reporting that she was still having left ankle pain, although Dr. Ikard noted no significant abnormalities. On February 24, Dr. Ikard prescribed a brace for the claimant's ankle and referred her for physical therapy. When she returned on March 11, 2010, she reported that she had experienced some improvement, but her ankle was still very sore. Dr. Ikard noted that she walked with a minimal limp. On examination, there were no sensory, reflex, or motor abnormalities, and the claimant demonstrated a good range of motion with no instability to stress testing. Dr. Ikard advised her that she could return to work on March 15, 2010, at a seated position, if possible.

On April 15, 2010, Dr. Ikard noted that the claimant's ankle pain was improved, but he diagnosed plantar fasciitis. He noted that her musculoskeletal examination was otherwise normal, and there were no signs of any neurological abnormalities. He instructed the claimant in stretching exercises to do at home and advised her about appropriate footwear and anti-inflammatory medication. He indicated that she could go back to work the next day.

On June 2, 2010, the claimant sought treatment from Dr. Judy Travis for pain in her left ankle and the bottom of her left foot. The claimant's blood pressure was in the normal range at 120/70, but her blood sugar level was very high at 372. Dr. Travis prescribed Glyburide, Amlodipine, and daily aspirin therapy. It does not appear that she prescribed any treatment for the claimant's complaint of left ankle and foot pain. The claimant returned on June 14, 2010, complaining of left wrist pain. The examination notes indicate that Dr. Travis ordered x-rays of the claimant's left hand, but there is no indication of the results. Dr. Travis continued the claimant on Glyburide and Amlodipine and did not prescribe any medication for pain or inflammation. At this visit, the claimant's blood pressure was moderately elevated at 150/82, but it does not appear that her blood sugar was measured.

On July 15, 2010, the claimant returned to Dr. Chu's office without any complaint of ankle pain, and nurse practitioner Bradford noted that her gait was normal. On examination, there were no signs of any motor, sensory, or reflex abnormalities, and the claimant demonstrated normal

strength and tone in her upper and lower extremities, bilaterally. The claimant's blood pressure was 158/88. Ms. Bradford noted that the claimant had been noncompliant with treatment, and she advised the claimant to take her medications as prescribed; however, she described the claimant's diabetes as uncomplicated and her hypertension as benign. She added several medications for treatment of these chronic conditions.

When the claimant returned on July 21, 2010, her blood pressure was 170/110, and she told Dr. Chu that it had been elevated for the past week because of anxiety. She did not report any musculoskeletal pain. Dr. Chu noted that the claimant's average glucose was 279, and her last hemoglobin A1C level was 11. He discontinued the claimant's Avandia prescription and started her on Victoza, noting that if her glucose started to be too low, he would stop her Glyburide. He provided diet and exercise recommendations and advised her to follow up in three weeks or sooner if needed.

It does not appear that the claimant ever returned to Dr. Chu's office for further treatment for her diabetes, hypertension, or other chronic problems.

On January 11, 2011, the claimant returned to Dr. Travis's office, complaining that her left foot was still hurting. She indicated that the pain was worse when she first woke up in the mornings. Her examination notes from this visit do not indicate any abnormal musculoskeletal findings, and the only medications she was prescribed were Glyburide for her diabetes and Amlodipine for her hypertension. Her non-fasting blood glucose level was 442, but her blood pressure was in the normal range at 130/80.

Dr. Huey Randolph Kidd performed a consultative medical examination of the claimant on July 19, 2011. The claimant reported pain in her feet, worse on the left, and stated that this pain had persisted in spite of extensive treatment, including physical therapy and injections. She said that her foot hurt all day, every day, but the pain was worse when she first got up in the morning and started to walk. The claimant also complained of pain in both knees, saying that they popped when she walked. She reported that her current medications included Acyclovir (an anti-herpetic medication), Amlodipine, and Glyburide. She did not indicate that she was taking any medications for pain or inflammation. Dr. Kidd noted that the claimant was 5'6" tall and weighed 199 pounds, and her blood pressure was 170/90. On examination, the claimant demonstrated full and equal strength and range of motion in [] her upper and lower extremities, including both knees and ankles, but she walked with a limp on the left side. Dr. Kidd noted that the claimant could walk on her heels and toes and bend over toward her toes, reaching about halfway down her shins, but she was very slow. She was able to squat while holding on to the exam table. Dr. Kidd ordered x-rays of the claimant's knees, which revealed

moderate degenerative changes consistent with bilateral osteoarthritis, mild on the left and mild to moderate on the right.

In addition to the physical problems discussed above, the medical evidence of record contains indications of some mental health issues. On March 22, 2011, the claimant sought treatment at the West Alabama Health Center. She reported no history of mental health treatment but indicated that she was feeling sad and stressed. She reported a major problem with depression, minor memory difficulties, and moderate problems with her general physical health, noting that she was a diabetic. The claimant was diagnosed with major depressive disorder without psychotic features. Her treatment plan indicates that she socialized by attending Bethlehem Baptist Church and devoted her leisure time to fishing. She returned for counseling on April 22, 2010, reporting that she was not having any depression. She explained that she was concerned about some personal matters but was coping. She indicated that her recovery goal was to start a business. Her therapist noted that she was calm with a normal affect and was making moderate progress. The therapist encouraged the claimant to cultivate positive relationships, use supportive therapy, structured activities, and family support.

**4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

.     .     .

The claimant's medically determinable mental impairment of major depressive disorder does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere.

.     .     .

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation that have been of extended duration, it is nonsevere.

. . . [T]he following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant requires a sit/stand option permitting her to change**

**positions at will. She can perform unskilled work, consisting of simple, routine, repetitive tasks consistent with SVP 1 or 2.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

.     .     .

On March 28, 2010, the claimant completed a function report in which she stated that she had foot pain that sometimes kept her from sleeping, and she was unable to walk or stand for long. She indicated that she had no difficulty caring for her personal needs, and about once a week, she performed household chores, such as preparing simple meals, washing laundry, ironing, and cleaning. She reported that she did not do yard work because she could not stand on her feet that long, but she indicated that she drove a car and shopped for groceries once or twice a month for two to three hours [at] a time. She indicated that she went to church as often as she could and spent time every day talking to people on the phone or computer. She reported that she managed her financial affairs. The claimant listed her hobbies and interests as reading, traveling, and talking with other people, and she indicated that she did these things as much and as often as she could, but her participation in social activities [was] limited because she could not stand like she used to do. She indicated that she had difficulty with walking and standing and stated that she could not walk or stand on her left foot for longer than 5-10 minutes. She indicated that she could only walk for about 30 minutes before needing to stop and rest, and she still occasionally used crutches that had been prescribed on February 2, 2010. The claimant indicated that she had no problem getting along with other people, but she could not pay attention for long, and her ability to follow written and spoken instructions was only fair. She indicated that she did not handle stress well, but she could cope fairly well with changes in routine.

.     .     .

At the hearing on June 7, 2011, the claimant testified that she was diagnosed with diabetes about 15 or 16 years ago and was prescribed insulin about 10 years ago. She said that she only remained on insulin for about a year. She explained that Dr. Chu advised her she could stop taking insulin if she lost 100 pounds. Although she did not lose any weight, her blood sugar stabilized on insulin to the point that Dr. Chu switched her from insulin to oral diabetes medication, and she has been taking pills for her diabetes since then. She admitted that she does not check her blood sugar as often as she should, explaining that she is

supposed to check it daily but usually only checks it every two weeks. She said that when she does check her blood sugar level, it is usually in the 200-400 range. She said that she keeps a log of her blood sugar readings and takes it with her when she goes to her doctor appointments, but Dr. Travis has not changed her diabetes medications or advised her to lose weight and seems to think her diabetes is reasonably well controlled. The claimant testified that she has pain in her feet, which she described as a burning, tingling sensation like pins sticking in her feet. She rated the severity of this pain as 9 on a 0-10 pain scale. She also reported frequent urination, fatigue, thirst, numbness in her hands, and difficulty sleeping. She also complained of continuing pain in her left ankle and in both knees, explaining that her right knee was worse than the left, and the pain in that knee and her left ankle was 9/10 in severity.

The claimant testified that she has been taking medication for high blood pressure for the past 18 years, but her blood pressure stays high and is elevated every time she goes to the doctor. She said that her doctor has advised her to avoid salt and sodas, and her blood pressure has been slightly better since she started following the recommendation, but it still stays too high, and her doctor has indicated that she may change her antihypertensive medication.

The claimant testified that she lives alone, but her adult children live nearby and come over to help her with household chores. She said that she sweeps about once a week and tries to do whatever is needed, but her son does her laundry, and she uses paper plates, so she does not have any dishes to wash. She said that she drives wherever she needs to go, and she shops for groceries. In terms of her specific limitations, the claimant said that she can sit for 30-45 minutes, stand maybe five minutes at most, and walk for 10-15 minutes. She said that she can lift a gallon of milk but has to use both hands.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of the claimant's alleged ankle pain, the medical evidence of record provides only limited support for her allegations. On March 15, 2010, less than two months after she sprained her ankle, Dr. Ikard released the claimant to return to work, specifying that she should work in a seated position, if possible. She testified that no seated work was available, and she tried to work while standing but had to leave after an hour. That testimony is generally consistent with Dr. Ikard's exam findings and recommendations; however, the undersigned notes that on April 15, 201[0], he determined that her ankle was improved, and he released her to work without any restrictions. Although he diagnosed plantar fasciitis, he

did not indicate any work-related limitations arising from this condition. A progress note from the claimant's physical therapist on April 15, 2010, indicates that her pain was reduced, and her gait and functioning were significantly improved, but she continued to express subjective complaints of pain, which the therapist described as "somewhat inconsistent". This evidence indicates significant healing of the claimant's ankle injury.

Her subsequent medical treatment records reflect periodic complaints of left ankle pain. She reported this pain to Dr. Travis in June 2010 but did not mention it to Dr. Chu or nurse practitioner Bradford in July 2010. Although she did complain of left foot and ankle pain in June 2010 and January 2011, Dr. Travis did not prescribe any pain or anti-inflammatory medications, nor did she refer the claimant for any orthopedic treatment or physical therapy. It appears that no other provider has prescribed any medication for the claimant's alleged knee and ankle pain. On March 22, 2011, when the claimant went to West Alabama Mental Health Center, she reported that the only prescribed medications she was taking were Acyclovir, Amlodipine, and Glyburide, and she was not taking any over-the-counter medications. This lack of treatment and medication is markedly inconsistent with the extreme levels of pain the claimant described in her hearing testimony.

The claimant does not take any pain medication, and her July 2011 knee x-rays showed only mild osteoarthritis of her left knee and mild to moderate osteoarthritis on the right. Accordingly, the medical evidence of record does not fully support the claimant's alleged limitations with regard to sitting, standing, and walking. The undersigned has limited the claimant to light work with a sit/stand option in order to accommodate any limitations arising from her knee problems. In doing so, the undersigned has considered the possible exacerbating effects of the claimant's obesity on the arthritis in her weight-bearing joints in accordance with Social Security Ruling 02-1p.

The medical evidence of record does not document any complications arising from the claimant's poorly controlled diabetes and hypertension, such as arterial damage, aneurysm, kidney disease, or heart damage. Although she testified that she experiences blurred vision two or three times a week, there are no references to this complaint in her medical treatment records, and Dr. Kidd noted that her vision exam was normal with 20/50 vision in both eyes, corrected to 20/20 with glasses. The claimant testified that she has severe neuropathy pain in her feet, as well as numbness in her hands, but these complaints are not reflected in the medical evidence of record. There are no indications of any sensory abnormalities, and she has not been prescribed any medication to treat nerve pain. When Dr. Kidd examined the claimant on July 19, 2011, he noted that she had a full range of motion in both of her upper and lower extremities, and he did not indicate any signs of neuropathy.

.     .     .

Although the claimant's treatment records from West Alabama Mental Health Center do not indicate that her depression significantly limits her ability to function, the undersigned has considered the claimant's depression in limiting her to unskilled work.

The claimant's receipt of unemployment benefits raises a considerable credibility issue. Although she was apparently employed by New Era Cap Company during the third and fourth quarters of 2009, she also received unemployment benefits in these quarters. She collected no unemployment benefits during the first quarter of 2010, but she did receive unemployment payments during the second, third, and fourth quarters of the year. She testified that she is continuing to collect these payments, but they will run out soon. The claimant's receipt of unemployment benefits indicates that she has represented herself to the State of Alabama as ready, willing, and able to work, while at the same time indicating to the Social Security Administration that she has impairments of such severity that she is completely unable to work. These mutually exclusive representations raise significant issues of credibility. By definition, disabled persons are not eligible for unemployment benefits. According to Alabama state law, if sickness or injury prevents an applicant from working on a job for which he or she is qualified based on past experience and/or training, unemployment benefits can be denied until such time that the claimant can provide proof that he or she is able to work. Further, an applicant is required to make an active search for work each week that he or she wishes to receive unemployment benefits. At the disability hearing, the claimant admitted that she calls the unemployment office every week and says that she is actively looking for a job, although she has not actually applied for any jobs since her alleged onset date of disability.

The record also shows the claimant reported that her plan was to start her own business, an admission that is clearly inconsistent with any allegation of disabling symptoms.

As for the opinion evidence, the undersigned gives significant weight to Dr. Kidd, who provided a medical source statement indicating that the claimant could frequently lift and carry up to 20 pounds, and during the course of an eight-hour workday, she could sit for six hours at a time, eight hours in total, stand for two hours at a time, three hours in total, and walk for one hour at a time, two hours in total. He indicated that there were no limitations in her ability to use her upper extremities for reaching, handling, fingering, feeling, and pushing/pulling, and she could continuously use her feet to operate foot controls. Dr. Kidd indicated that the claimant could occasionally perform postural activities, such as climbing, balancing, stooping, kneeling, crouching, and crawling. He specified that the claimant had no limitations in her ability to see and hear. This assessment merits significant weight, as it is fully consistent with the examination findings and with other medical evidence of record, which indicate no chronic problems related to claimant's spine or upper

extremities and no indications of any neurosensory, motor, or reflex deficits.

The undersigned gives only limited weight to the medical source statement provided by Dr. Judy Travis on May 5, 2011. Dr. Travis indicated that during the course of an eight-hour workday, the claimant could sit for four hours and stand/walk for less than one hour. She specified that the claimant could lift and carry up to one pound frequently and five pounds occasionally. Dr. Travis indicated that the claimant could never work with or around hazardous machinery and only rarely perform pushing/pulling actions, climb stairs or ladders, and balance. She indicated that the claimant could occasionally operate motor vehicles, bend, and stoop, and she could frequently reach overhead. Dr. Travis specified that the claimant could frequently use her hands for gross manipulation but only occasionally for fine manipulation. She predicted that the claimant would miss more than three days of work per month because of her impairments or the need for treatment. She further indicated that the claimant experienced pain of such severity as to distract her from adequate performance of daily activities, and physical activity would greatly increase her pain. She further indicated that the claimant experienced significant medication side effects, which could be expected to limit the effectiveness of her activities of work or daily living. Dr. Travis stated that these limitations were caused by poorly-controlled diabetes, peripheral neuropathy, left foot tendonitis, and severe degenerative arthritis of the left knee.

This medical source statement merits little weight, as it is markedly inconsistent with the medical evidence of record, including the claimant's treatment records from Dr. Travis's office. These records reflect no diagnoses of peripheral neuropathy or tendonitis, and there are no findings elsewhere in the medical evidence of record consistent with these diagnoses. Although Dr. Travis indicated that the claimant suffers severe pain and medication side effects, she has not prescribed any pain medications or medications normally prescribed for nerve pain, such as Lyrica or Neurontin. There are no documented problems regarding the claimant's use of her hands for gross or fine manipulation. Neurological testing remained intact and the consultative examiner found her fine and gross manipulative ability to be fully intact. In fact, the claimant admitted she uses a computer two to three hours a day. She plays solitaire and other computer games, an activity that shows she retains use of her hands for manipulative motions. There is no medical corroboration for the reported need for five to six unscheduled bathroom breaks, inability to work an eight hour day or to miss up to three days of work a month. There are no chronic problems related to the claimant's spine or upper extremities and no indications of any neurosensory, motor, or reflex deficits. Visits have been of a routine nature, with evidence of noncompliance in the record. The claimant continues to engage in a wide array of activities including shopping and driving. Accordingly, the undersigned finds that Dr. Travis's medical source statement is

inconsistent with her treatment records and with the other medical evidence of record.

**6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

.      .      .

**7.      The claimant was born on October 29, 1964 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).**

.      .      .

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21; however, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors, the individual would be able to perform the requirements of representative occupations such as: hand packer/inspector (DOT# 559.687-074, light unskilled, approximately 5,500 jobs in Alabama and 330,000 jobs in the U.S.); bench assembler, small products (DOT# 706.684-022, light, unskilled, approximately 8,000 jobs in the state and 500,000 jobs nationally); and storage facility rental clerk (DOT# 295.367-026, light, unskilled, approximately 7,000 jobs locally and 440,000 jobs nationally). Dr. Sweeney testified that the numbers of jobs he listed represent a reduction, where applicable, in the total number of jobs existing in the state and national economies to include only those jobs that would permit a sit/stand option.

Pursuant to Social Security Ruling 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles with the exception of the information []he provided regarding the sit/stand option. This option is not covered by the DOT, so Dr. Sweeney relied on his professional knowledge and experience in order to provide information regarding the existence of jobs that would accommodate a sit/stand option.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 2, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

(Tr. 12-13, 13-15, 15, 16, 16-17, 17, 17-19, 19-21, 22 & 22-23 (internal citations omitted; emphasis in original).)  The Appeals Council affirmed the ALJ's decision (Tr. 1-3) and thus, the hearing decision became the final decision of the Commissioner of Social Security.

## DISCUSSION

In all Social Security cases, the claimant bears the burden of proving that she is unable to perform her previous work.  *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors:  (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.  *Id.* at 1005. Once the claimant meets this burden, as here, it becomes the Commissioner's burden to prove that the claimant is capable, given her age, education and work history, of engaging in another kind of substantial gainful employment which exists in the national economy.  *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she can perform those light jobs allowing for a sit/stand option identified by the vocational expert, is supported by substantial evidence.  Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).  "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[3]

In this case, the plaintiff contends that the ALJ committed the following errors: (1) she erroneously rejected the opinions of the treating physician, Dr. Judy Travis; (2) she erroneously gave significant weight to the opinion of the consultative examiner, Dr. Huey Kidd; (3) she conducted a flawed credibility evaluation; and (4) she erroneously determined Witherspoon could perform unskilled light jobs with a sit/stand option permitting her to change positions at will.

The undersigned will consider these issues in order but prior to doing so it is necessary for the Court to set forth the proper analysis for consideration of RFC "issues" implicitly raised in cases like the instant one. The Eleventh Circuit has made clear that "[r]esidual functional capacity, or RFC, is a medical assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." *Peeler v. Astrue*, 400 Fed.Appx. 492, 493 n.2 (11th Cir. Oct. 15, 2010), citing 20 C.F.R. § 416.945(a).

---

[3]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

Stated somewhat differently, "[a] claimant's RFC is 'that which [the claimant] is still able to do despite the limitations caused by his . . . impairments.'" *Hanna v. Astrue*, 395 Fed.Appx. 634, 635 (11th Cir. Sept. 9, 2010), quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). "In making an RFC determination, the ALJ must consider all the record evidence, including evidence of non-severe impairments." *Hanna, supra* (citation omitted); *compare* 20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1) (2011) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.") *with* 20 C.F.R. §§ 404.1545(a)(3) & 416.945(a)(3) ("We will assess your residual functional capacity based on all of the relevant medical and other evidence.").

From the foregoing, it is clear that the ALJ is responsible for determining a claimant's RFC, a deep-seated principle of Social Security law, 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level under § 404.929 or at the Appeals Council review level under § 404.967, the administrative law judge or the administrative appeals judge at the Appeals Council (when the Appeals Council makes a decision) is responsible for assessing your residual functional capacity."); *see also* 20 C.F.R. § 416.946(c) (same), that this Court has never taken issue with. *See, e.g., Hunington ex rel. Hunington v. Astrue,* No. CA 08-0688-WS-C, 2009 WL 2255065, at *4 (S.D. Ala. July 28, 2009) ("Residual functional capacity is a determination made by the ALJ[.]") (order adopting report and recommendation of the undersigned). The regulations provide, moreover, that while a claimant is "responsible for providing the evidence [the ALJ] . . . use[s] to make a[n] [RFC] finding[,]" the ALJ is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary," and helping the claimant get medical reports from her own medical sources. 20 C.F.R. §§ 404.1545(a)(3) & 416.945(a)(3). In assessing RFC, the ALJ must consider any statements about what a claimant can still do "that have been

14

provided by medical sources," as well as "descriptions and observations" of a claimant's limitations from her impairments, "including limitations that result from [] symptoms, such as pain[.]" *Id*.

In determining a claimant's RFC, the ALJ considers a claimant's "ability to meet the physical, mental, sensory, or other requirements of work, as described in paragraphs (b), (c), and (d) of this section." 20 C.F.R. §§ 404.1545(a)(4) & 416.945(a)(4).

> (b) *Physical abilities*.  When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

> (c) *Mental abilities.*  When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

> (d) *Other abilities affected by impairment(s)*.  Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s), we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

20 C.F.R. §§ 404.1545(b), (c) & (d) and 416.945(b), (c) & (d).

Against this backdrop, this Court starts with the proposition that an ALJ's RFC determination necessarily must be supported by substantial evidence. *Compare Figgs v. Astrue,* 2011 WL 5357907, *1 & 2 (M.D. Fla. Oct. 19, 2011) ("Plaintiff argues that the ALJ's residual functional capacity ('RFC') determination is not supported by substantial

evidence. . . . [The] ALJ's RFC Assessment is [s]upported by substantial record evidence[.]"), *report & recommendation approved,* 2011 WL 5358686 (M.D. Fla. Nov. 3, 2011), and *Scott v. Astrue,* 2011 WL 2469832, \*5 (S.D. Ga. May 16, 2011) ("The ALJ's RFC Finding Is Supported by Substantial Evidence[.]"), *report & recommendation adopted,* 2011 WL 2461931 (S.D. Ga. Jun. 17, 2011) *with Green v. Social Security Administration,* 223 Fed.Appx. 915, 923 & 923-924 (11th Cir. May 2, 2007) (per curiam) ("Green argues that without Dr. Bryant's opinion, there is nothing in the record for the ALJ to base his RFC conclusion that she can perform light work. . . . Once the ALJ determined that no weight could be placed on Dr. Bryant's opinion of [] Green's limitations, the only documentary evidence that remained was the office visit records from Dr. Bryant and Dr. Ross that indicated that she was managing her respiration problems well, that she had controlled her hypertension, and that her pain could be treated with over-the-counter medication. Thus, substantial evidence supports the ALJ's determination that Green could perform light work."). And while, as explained in *Green, supra*, an ALJ's RFC assessment may be supported by substantial evidence even in the absence of an opinion by an examining medical source about a claimant's residual functional capacity, specifically because of the hearing officer's rejection of such opinion,[4] 223 Fed.Appx. at 923-924; *see also id.* at 923 ("Although a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other

---

[4]     An ALJ's articulation of reasons for rejecting a treating source's RFC assessment must, of course, be supported by substantial evidence. *Gilabert v. Commissioner of Social Security*, 396 Fed.Appx. 652, 655 (11th Cir. Sept. 21, 2010) ("Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. In this case, therefore, the critical question is whether substantial evidence supports the ALJ's articulated reasons for rejecting Thebaud's RFC.") (citing *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005)); *D'Andrea v. Commissioner of Social Security Admin.*, 389 Fed.Appx. 944, 947-948 (11th Cir. Jul. 28, 2010) (per curiam) (same).

evidence presented and the ultimate determination of disability is reserved for the ALJ."), **<u>nothing</u>** in *Green* can be read as suggesting anything contrary to those courts—including this one—that have staked the position that the ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work.[5] *Compare, e.g., Saunders v. Astrue,* 2012 WL 997222, *5 (M.D. Ala. Mar. 23, 2012) ("It is unclear how the

---

[5]       In *Green, supra,* such linkage was easily identified since the documentary evidence remaining after the ALJ properly discredited the RFC opinion of the treating physician "was the office visit records from Dr. Bryant and Dr. Ross that indicated that [claimant] was managing her respiration problems well, that she had controlled her hypertension, and that her pain could be treated with over-the-counter medication." 223 Fed.Appx. at 923-924. Based upon such nominal clinical findings, the court in *Green* found "substantial evidence support[ing] the ALJ's determination that Green could perform light work." *Id*. at 924; *see also Hovey v. Astrue,* Civil Action No. 1:09CV486-SRW, 2010 WL 5093311, at *13 (M.D. Ala. Dec. 8, 2010) ("The Eleventh Circuit's analysis in *Green,* while not controlling, is persuasive, and the court finds plaintiff's argument . . . that the ALJ erred by making a residual functional capacity finding without an RFC assessment from a physician without merit. In formulating plaintiff's RFC in the present case, the ALJ—like the ALJ in *Green*—relied on the office treatment notes of plaintiff's medical providers.").

        Therefore, decisions, such as *Stephens v. Astrue*, No. CA 08-0163-C, 2008 WL 5233582 (S.D. Ala. Dec. 15, 2008), in which a matter is remanded to the Commissioner because the "ALJ's RFC determination [was not] supported by substantial and tangible evidence" still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that "substantial and tangible evidence" **must—in all cases—include** an RFC or PCE from a physician.  *See id.* at *3 ("[H]aving rejected West's assessment, the ALJ **necessarily had to** point to a PCE which supported his fifth-step determination that Plaintiff can perform light work activity.") (emphasis added).  But, because the record in *Stephens*

> contain[ed] no physical RFC assessment beyond that performed by a disability examiner, which is entitled to no weight whatsoever, there [was] simply no basis upon which this court [could] find that the ALJ's light work RFC determination [was] supported by substantial evidence.  [That] record [did] not reveal evidence that would support an inference that Plaintiff [could] perform the requirements of light work, and certainly an ALJ's RFC determination must be supported by substantial and tangible evidence, not mere speculation regarding what the evidence of record as a whole equates to in terms of physical abilities.

*Id.* (citing *Cole v. Barnhart*, 293 F. Supp.2d 1234, 1242 (D. Kan. 2003) ("The ALJ is responsible for making a RFC determination, and he must link his findings to substantial evidence in the record and explain his decision.")).

ALJ reached the conclusion that Plaintiff 'can lift and carry up to fifty pounds occasionally and twenty-five pounds frequently' and sit, stand and/or walk for six hours in an eight hour workday, [] when the record does not include an evaluation of Plaintiff's ability to perform work activities such as sitting, standing, walking, lifting, bending, or carrying.") *with* 20 C.F.R. §§ 404.1545(b), (c) & (d) and 416.945(b), (c) & (d); *see also Packer v. Astrue,* 2013 WL 593497, *4 (S.D. Ala. Feb. 14, 2013) ("[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work.").

Indeed, the Eleventh Circuit appears to agree that such linkage is necessary for federal courts to conduct a meaningful review of an ALJ's decision. For example, in *Hanna, supra,* the panel noted that

> [t]he ALJ determined that Hanna had the RFC to perform a full range of work at all exertional levels but that he was limited to 'occasional hand and finger movements, overhead reaching, and occasional gross and fine manipulation.' In making this determination, the ALJ relied, in part, on the testimony of the ME. . . .
>
> The ALJ's RFC assessment, as it was based on the ME's testimony, is problematic for many reasons. . . . [G]iven that the ME opined only that Hanna's manipulation limitations were task-based without specifying how often he could perform such tasks, it is unclear how the ALJ concluded that Hanna could occasionally engage in all forms of hand and finger movements, gross manipulation, and fine manipulation. . . .
>
> The ALJ also agreed with the VE's testimony that, under the RFC determination, Hanna could return to his past work. **But this conclusion is not clear from the record.** The VE answered many hypothetical questions and initially interpreted the ME's assessment to mean that Hanna's gross manipulation abilities were unlimited and so, with only a restriction to fine manipulation, he could perform his past relevant work. In a separate hypothetical, the VE stated that a claimant could not return to his past work as a packaging supervisor if restricted to occasional fingering, handling, and gross and fine manipulation. The ALJ also did not include the ME's steadiness restriction in the RFC assessment; and the VE testified that a person restricted to handling that required steadiness would not be able to return to Hanna's past work.

18

> **The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review.** The ALJ has not done so here. To the extent the ALJ based Hanna's RFC assessment on hearing testimony by the ME and VE, the assessment is inconsistent with the evidence. The ALJ did not explicitly reject any of either the ME's or VE's testimony or otherwise explain these inconsistencies, the resolution of which was material to whether Hanna could perform his past relevant work. **Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not provide a meaningful basis upon which we can review Hanna's case."**

395 Fed.Appx. at 635-636 (emphasis added and internal citations and footnotes omitted); *see also Ricks v. Astrue*, No. 3:10–cv–975–TEM, 2012 WL 1020428, at *9 (M.D. Fla. Mar. 27, 2012) ("'The existence of substantial evidence in the record favorable to the Commissioner may not insulate the ALJ's determination from remand when he or she does not provide a **sufficient rationale to link such evidence to the legal conclusions reached**.' Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow him to explain the basis for his decision.") (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)) (emphasis added); *cf. Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) ("The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal.") (citation omitted).

Such linkage, moreover, may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the ALJ's decision. *See, e.g., Durham v. Astrue*, Civil Action No. 3:08CV839-SRW, 2010 WL 3825617, at *3 (M.D. Ala. Sep. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e]

what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision] when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'") (quoting *Hanna*, 395 Fed. Appx. at 636 (internal quotation marks omitted)); *see also id.* at *3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ could have relied . . . .  There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion].  However, because the ALJ did not state his reasons, the court cannot evaluate them for substantial evidentiary support.  Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not conduct the analysis that the law requires him to conduct.").

Prior to addressing the four specific errors raised by the claimant, the Court would note that the ALJ in this case specifically linked her RFC assessment—that is, unskilled light work with a sit/stand option—to specific evidence in the record bearing upon Witherspoon's ability to perform the physical, mental, sensory and other requirements of work. Such linkage is provided not solely by Dr. Huey Kidd's examination findings and physical medical source statement (Tr. 497-505) but also by all remaining medical evidence of record (Tr. 316, 319-324, 364-368, 372-374, 395, 401, 445-450 & 477-491; *cf.* Tr. 267-282 & 454-457)—including the office notes of plaintiff's more recent treating physician, Dr. Judy Travis (Tr. 442-443 & 468)—except for Dr. Travis' physical medical source and pain assessments (Tr. 473-474).  As previously explained, the Eleventh Circuit indicated in *Green* that where an ALJ articulates specific reasons, supported by substantial evidence, for failing to give the RFC opinion of a treating physician controlling weight, and the ALJ properly links the remaining evidence of record (after such rejection) to the RFC assessment, such assessment can be found to be supported by substantial evidence. *See* 223 Fed.Appx. at 923-924. Since this is exactly

what has happened in the instant case, the undersigned now considers the plaintiff's alleged errors in order.

     A.   **RFC and Pain Opinions of Dr. Judy Travis**. Witherspoon contends that the ALJ improperly accorded the RFC and pain opinions of her treating physician, Dr. Judy Travis, little weight instead of the substantial weight they were entitled to receive.

> The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause is shown when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. *Moore [v. Barnhart]*, 405 F.3d [1208,] 1212 [(11th Cir. 2005)].

*Gilabert, supra,* 396 Fed.Appx. at 655.

In this case, the ALJ accorded "little" weight to any of Dr. Judy Travis' medical opinions rendered on May 5, 2011 (*see* Tr. 21): her findings on the physical medical source statement reflecting an inability to perform any work on a sustained basis (Tr. 473); and her pain assessment findings reflecting the presence of pain to such an extent as to be distracting to the adequate performance of daily activities, that physical activity greatly increases pain to such a degree as to cause distraction from task or total abandonment of task, and that significant side effects may be expected from prescribed medications which may limit effectiveness of work duties or performance of everyday tasks such as driving (Tr. 474). This Court will not again set forth the ALJ's rather lengthy analysis of the opinion evidence offered by Dr. Travis. Instead, the Court simply observes that this portion of the ALJ's decision (*see* Tr. 21) certainly reflects an articulation of specific and adequate reasons, supported by substantial evidence, for rejecting the various opinions offered by Dr. Travis. *See Gilabert, supra,* 396 Fed.Appx. at

655. In particular, this Court agrees with the ALJ that Dr. Travis' physical medical source and pain assessments, to the extent they relate to "peripheral neuropathy" and "left-foot tendonitis" (*see* Tr. 473-474), are entitled to little weight given that Dr. Travis' own treatment records do not reflect these diagnoses (*see* Tr. 442-443 & 468),[6] the remaining evidence of record contain no findings consistent with these diagnoses (*see, e.g.*, Tr. 316, 319-324, 364-368, 372-374, 395, 401, 445-450 & 477-491), and plaintiff has not been prescribed any medications dedicated to nerve pain—such as Lyrica or Neurontin (Tr. 21)—or, for that matter, any  type of pain.[7] Moreover, to the extent the limitations noted on the physical medical source statement are related to plaintiff's "poorly controlled diabetes," the undersigned agrees with the ALJ not only that such limitations are not supported anywhere in the record (*compare* Tr. 442-443 & 468 *with* Tr. 316, 319-324, 364-368, 372-374, 395, 401, 445-450 & 477-491),[8] but, as well, because all evidence of poor control stems from Witherspoon's noncompliance with her medication regimen (*compare* Tr. 450 *with* Tr. 554). Finally, the ALJ was correct in rejecting any suggestion by Travis that plaintiff's "severe degenerative arthritis of the left knee" could lead to the noted limitations (*see* Tr. 473), not only because Travis' treatment records make no mention of any left-knee complaints (*see* Tr. 442-443 & 468) but, as well, because x-rays of the left knee on July 19, 2011 revealed only "moderate degenerative changes

---

[6]        In addition, nothing in the medical evidence supports Travis' conclusory estimate that plaintiff's impairments and her treatment would cause her to miss work more than three times a month. (*See* Tr. 473.)

[7]        This Court is of the opinion that the failure of Dr. Travis to prescribe pain medication or anti-inflammatories to Witherspoon totally undermines her assessment regarding the pain and medication side effects allegedly experienced by plaintiff. Travis' pain assessment was properly accorded little weight by the ALJ.

[8]        Indeed, there is absolutely nothing in the record reflecting functional limitations attributable to these impairments.

involving the medial aspect of the knee joint, degenerative joint disease, [and] mild osteoarthritis." (Tr. 499.)

In light of the foregoing, the ALJ properly afforded little weight to the physical medical source and pain assessments submitted on plaintiff's behalf by Dr. Judy Travis.

**B.    The Weight Afforded the Opinion of the Consultative Examiner**. Plaintiff next contends that that the ALJ erred in giving significant weight to the consultative examiner, Dr. Huey Kidd. Witherspoon claims that Kidd's opinion was not entitled to significant weight because the consultative examiner did not review any other records and did not address impairments evident at the examination, specifically plaintiff's obesity.

While it is clear, as a general proposition, that a one-time consultative physician's opinion is entitled to less weight than a treating physician's opinion, *see, e.g., Kelly v. Commissioner of Social Security*, 401 Fed.Appx. 403, 407 (11th Cir. Oct. 21. 2010) ("Generally, the opinions of examining physicians are given more weight than non-examining physicians and the opinions of treating physicians are given more weight than non-treating physicians."), it is apparent to the Court that the ALJ in this case properly accorded significant weight to Dr. Kidd's physical medical source statement (*compare* Tr. 20 *with* Tr. 500-505) because Kidd's opinion is supported by all **medical** evidence of record (*compare id. with* Tr. 267-282, 316, 319-324, 364-368, 372-374, 395, 401, 445-450 & 454-457). Therefore, even had Kidd not reviewed any of the other existing medical evidence of record, which he clearly did (*compare* Tr. 498 ("The medical evidence of record, provided by the DDS, was reviewed and considered in the overall assessment of the patient.") *with* Tr. 497 ("PAST MEDICAL HISTORY: Diabetes,

hypertension. PAST SURGICAL HISTORY: Bilateral tubal ligation.")), there would be no error.[9] Moreover, Kidd's failure to specifically discuss plaintiff's obesity does not merit giving the consultative examiner's RFC assessment less weight inasmuch as there is nothing in the medical evidence which establishes that there are physical limitations attributable to Witherspoon's obesity more severe than the limitations noted by Kidd or found by the ALJ.

      **C.**    <u>**The ALJ's Credibility Evaluation**</u>.  Plaintiff next contends that the ALJ conducted a flawed credibility evaluation based on the following errors: (1) she noted plaintiff did not take any pain medications even though the medication list includes aspirin; and (2) she improperly construed records showing that plaintiff's recovery goal was to start a new business as inconsistent with her claim of disability.[10]

      The Eleventh Circuit has consistently and often set forth the criteria for establishing disability based on testimony about pain and other symptoms. *See, e.g.,*

---

[9]     This Court cannot fault Dr. Kidd for failing to "pick up" on Travis' arguable peripheral neuropathy "diagnosis" since those words appear only on Travis' physical medical source statement (Tr. 473) but nowhere in the treating physician's examination records (*see* Tr. 442-443 & 468).

[10]    Plaintiff maintains that the ALJ should have found moderate limitations in one or more areas of mental functioning based on two GAF scores of 55 instead of indicating that any limitations from depression were accounted for by a limitation to unskilled work. To the extent Witherspoon argues that the ALJ's finding in this regard results in a flawed credibility evaluation the undersigned cannot agree because the claimant not once mentioned at the hearing that she was depressed or that she was in any manner limited by such depression (*see* Tr. 34-74) and the month's worth of evidence from the West Alabama Mental Health Center reflects that on the last day plaintiff presented to the center she reported no depression (Tr. 480; *compare id. with* Tr. 477-479 & 481-495). Moreover, the ALJ did not find plaintiff's alleged depression to be a severe impairment (*compare* Tr. 13 *with* Tr. 15) and plaintiff makes no argument to the contrary (*see* Doc. 15). Therefore, the ALJ properly found that plaintiff's depression caused no more than "minimal limitation in the claimant's ability to perform basic mental work activities[.]" (Tr. 15.) Because plaintiff's depression is not a severe impairment, the undersigned finds nothing inherently "wrong" in the ALJ's statement that limiting plaintiff to unskilled work takes into consideration her non-severe depression. (*See* Tr. 19.)

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citations omitted); *Holt v.*

*Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991).

> [T]he claimant must satisfy two parts of a three-part test showing: (1)
> evidence of an underlying medical condition; and (2) either (a) objective
> medical evidence confirming the severity of the alleged pain; or (b) that
> the objectively determined medical condition can reasonably be expected
> to give rise to the claimed pain.[11] If the ALJ discredits subjective
> testimony, he must articulate explicit and adequate reasons for doing so.
> Failure to articulate reasons for discrediting subjective testimony requires,
> as a matter of law, that the testimony be accepted as true.

*Wilson, supra,* at 1225 (internal citations omitted; footnote added).

"20 C.F.R. § 404.1529 provides that once such an impairment is established, all

evidence about the intensity, persistence, and functionally limiting effects of pain or

other symptoms must be considered in addition to the medical signs and laboratory

findings in deciding the issue of disability." *Foote v. Chater,* 67 F.3d 1553, 1561 (11th Cir.

1995).  In other words, once the issue becomes one of credibility and, as set forth in SSR

96-7p, in recognition of the fact that a claimant's symptoms can sometimes suggest a

greater level of severity of impairment than can be shown by objective medical evidence

alone, the adjudicator (ALJ) in assessing credibility must consider in addition to the

objective medical evidence the other factors/evidence set forth in 20 C.F.R.

§§ 404.1529(c) and 416.929(c). More specifically, "[w]hen evaluating a claimant's

subjective symptoms, the ALJ ***must*** consider the following factors: (i) the claimant's

'daily activities; (ii) the location, duration, frequency, and intensity of the [claimant's]

pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) the type,

---

[11]    "Medical history and objective medical evidence such as evidence of muscle
atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually
reliable indicators from which to draw reasonable conclusion about the intensity and
persistence of pain and the effect such pain may have on the individual's work capacity." SSR
88-13.

dosage, effectiveness, and side effects of any medication the [claimant took] to alleviate pain or other symptoms; (v) treatment, other than medication, [the claimant] received for relief . . . of pain or other symptoms; and (vi) any measures the claimant personally used to relieve pain or other symptoms.'" *Leiter v. Commissioner of Social Security Administration*, 377 Fed.Appx. 944, 947 (11th Cir. May 6, 2010) (emphasis supplied), quoting 20 C.F.R. §§ 404.1529(c)(3) & 416.929(c)(3).

In this case, the ALJ clearly recognized that plaintiff's impairments met the pain standard (*see* Tr. 18 ("[T]he undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms[.]")) yet found that her subjective pain complaints were not entirely credible (*see id*. ("[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.")). Further, the undersigned finds that the ALJ made a specific credibility finding, *see Chater, supra*, at 1561, and in doing so specifically considered the objective medical evidence of record and the other factors/evidence set forth in 20 C.F.R. §§ 404.1529(c) and 416.929(c) (*see* Tr. 16-20).

In assessing the credibility of Witherspoon's subjective complaints of pain, the arguments are made that the ALJ erred in referencing that plaintiff does not take any pain medication since her medication list includes aspirin and, further, that the ALJ improperly construed records showing that plaintiff's recovery goal was to start a new business as being inconsistent with her claim of disability. The undersigned cannot agree with plaintiff's first assignment of error since the Commissioner's regulations specifically direct ALJs to consider the type, dosage, effectiveness, and side effects of

any medication taken to alleviate pain or other symptoms, *see, e.g.*, 20 C.F.R. §

404.1529(c)(3)(iv) (2012),[12] and Witherspoon's updated medication list does not include

aspirin (Tr. 252). Moreover, on the medication list Witherspoon identified aspirin, she

specifically stated she took one aspirin a day not for pain but to combat leg cramps. (Tr.

245.) Thus, the undersigned concludes that the ALJ's observation that plaintiff does not

take any pain medication constitutes an explicit and adequate reason for discrediting

her pain allegations and other subjective symptoms. *See Kersey v. Astrue,* 2010 WL

1049575, *6 (M.D. Fla. Mar. 22, 2010) ("The ALJ specifically noted that Plaintiff has not

sought treatment for her pain with the frequency that one would expect, considering

her allegations of pain. The ALJ also observed that Plaintiff was not taking prescription

medication for pain. Plaintiff does not challenge these factual findings or provide any

reason why pain treatment had not been sought for a substantial period of time prior to

the hearing. Under the circumstances, the reasons articulated by the ALJ are adequate

to discredit Plaintiff's allegations of pain and other symptoms." (internal citations

omitted).)

　　　　Turning to plaintiff's second assignment of error in this regard, even if this Court

agrees that her "recovery goal [or dream]" of starting her own business is not

inconsistent with her allegations of disabling symptoms—as found by the ALJ (Doc.

20)—finding this reason inadequate does not warrant reversal of the ALJ's credibility

determination. This is because the ALJ's observations about claimant not taking pain

medication and her receipt of unemployment benefits while pursuing a disability

---

[12]    Obviously, therefore, the fact that a claimant is not prescribed any strong pain-killing medication would negate a claimant's testimony that the pain she experiences daily is 9 on a scale of 0 to 10 (*see* Tr. 36 & 39).

claim[13] constitute explicit and adequate reasons for the credibility determination made in this case.

### D.      Whether the ALJ Erred in Finding Plaintiff Could Perform Unskilled Light Jobs with a Sit/Stand Option Permitting her to Change Positions at Will.

Plaintiff's final claim is that the ALJ's assignment of an RFC for light unskilled work with a sit/stand option permitting her to change positions at will (Tr. 16) does not correlate precisely with the hypothetical situations posed to the VE (*compare id. with* Tr. 77-81 (frequency of changing positions not mentioned)) and, therefore, the RFC determination is not supported by substantial evidence. In addition, plaintiff also contends that the ALJ failed to ask the VE whether there was a conflict between his testimony and the Dictionary of Occupational Titles ("DOT") and, instead, merely told the VE that it was his duty to point out any such conflict.[14]

---

[13]      "[A]n ALJ may certainly consider a claimant's receipt of unemployment compensation in making a credibility determination[,]" *Kalishek v. Astrue*, 2011 WL 4389643, *5 (M.D. Fla. Aug. 23, 2011) (citations omitted), *report & recommendation adopted*, 2011 WL 4389717 (M.D. Fla. Sept. 21, 2011), *aff'd*, 470 Fed.Appx. 868 (11th Cir. May 30, 2012); *see also Carmickle v. Commissioner, Social Security Administration*, 533 F.3d 1155, 1161-1162 (9th Cir. 2008) (acknowledging that "receipt of unemployment benefits can undermine a claimant's alleged inability to work fulltime"); *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) ("[W]e are not convinced that a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely *no* role in assessing his subjective complaints of disability." (emphasis in original)); *Workman v. Commissioner of Social Security*, 105 Fed.Appx. 794, 801 (6th Cir. July 29, 2004) ("Applications for unemployment and disability benefits are inherently inconsistent."); *see Peden v. Astrue*, 2012 WL 5379172, *5 (N.D. Ala. Oct. 31, 2012) (finding the ALJ's determination that claimant's unemployment application detracted from her credibility supported by substantial evidence), and can, therefore, consistently find that a claimant's subjective allegations (including allegations of total disability) "are inconsistent with h[er] receipt of unemployment benefits where [s]he held h[er]self out as being able to work." *Butler v. Commissioner of Social Security*, 2012 WL 628489, *7 (M.D. Fla. Feb. 27, 2012) (citations omitted); *see also Bullock v. Astrue*, 2012 WL 2357718, *7 (N.D. Ala. June 20, 2012) ("[T]he receipt of unemployment benefits requires a claimant to demonstrate they are able to work—a position inherently contradictory to the requirements of disability benefits.").

[14]      Plaintiff contends that the ALJ's failure in this regard is important because the Commissioner bears the burden of determining whether there is a conflict, in accordance with (Continued)

While it is certainly true that the ALJ failed to specify in her hypotheticals posed to the VE the frequency that Witherspoon needed to change her sit/stand position, her instruction to the VE to "add" a sit/stand option (Tr. 78-79) contains the reasonable "implication" that "the sit/stand option would be at [claimant's] own volition." *Williams v. Barnhart,* 140 Fed.Appx. 932, 937 (11th Cir. Aug. 15, 2005); *cf. Thompson v. Astrue,* 442 Fed.Appx. 804, 806 & 807 (4th Cir. Aug. 10, 2011) ("Thompson also notes that although the ALJ found she required a sit-stand option, he failed to state how frequently she needed to alternate between sitting and standing. . . . The ALJ's RFC finding and hypothetical were consistent with an at-will sit-stand option, and we find that no greater specificity was required here."). Accordingly, the Court need **REJECT** the plaintiff's argument that the ALJ's RFC determination is not supported by substantial evidence.

As for plaintiff's second prong of attack, the undersigned is of the opinion that the ALJ's admonition to the VE to advise her of any conflict between his testimony and the DOT (Tr. 75) and any arguable failure by the VE to advise the ALJ of any conflict (*see* Tr. 75-82)[15] properly leads to the reasonable conclusion that no conflict existed

_____

SSR 00-4p, and SSR 83-12 and the DOT do not indicate that any jobs can be performed with a sit/stand option.

[15]    The undersigned specifically modifies "failure" with "arguable" inasmuch as the VE's testimony can be read as establishing his implicit recognition that the sit/stand option "added" by the ALJ to her first hypothetical is not covered by the DOT given that he took pains to "cut" the number of the identified jobs available to the hypothetical individual. (*See* Tr. 79-80 ("I will stay at light, hand packer inspector, that's hand packer not machine, with inspection duties associated with it. That's light work. It's unskilled. DOT number assigned to this [is] 559.687-074. Employment in the local economy is shown to be 11, 000 with the national economy 600,000[;] however, in my opinion not each and every one of these situations would lend itself to sit, stand which is partly at the employer's discretion and I'm going to believe that the employment opportunities are cut by 50 percent at least so we're talking 5,500 for that local economy, 330,000 in the national economy. Okay, another is bench assembler, small products, light work, unskilled a 2 SVP. The DOT is 706.685-022. Again, while the job does lend itself to a (Continued)

between his testimony and the DOT. *Compare Williams, supra,* 140 Fed.Appx. at 937

("Although the ALJ failed to specify the frequency that Williams needed to change his

sit/stand position, the reasonable implication of the ALJ's description was that the

sit/stand option would be at William's own volition.") *with Williams v. Astrue,* 2011 WL

3875615, *2 (M.D. Ala. Aug. 31, 2011) ("At the administrative hearing, a vocational

expert testified that a hypothetical individual limited as described by the ALJ—

including the option to 'sit, stand, or walk for one hour at a time before needing to

change positions for at least 10 minutes'—could perform jobs as a housekeeper cleaner,

ticket taker, and microfilm processor. The VE responded affirmatively when the ALJ

asked, 'Is your testimony consistent with the *Dictionary of Occupational Titles*?'" (internal

citation and footnote omitted; emphasis in original).) In other words, as specifically

recognized by this Court in *Hall v. Astrue,* 2010 WL 2643565 (S.D. Ala. June 29, 2010):

> Plaintiff has not established that the ALJ violated SSR 00-4p. The ALJ
> expressly requested that the VE apprise her if the VE's testimony deviated
> from the DOT. The VE did not advise the ALJ of any conflicts, apparent or
> otherwise, and during the hearing, Plaintiff['s] counsel did not allege that
> there existed any conflicts nor did he question the VE regarding any
> purported conflicts. Because no conflicts were identified, the ALJ was not
> required under SSR 00-4p to elicit a reasonable explanation from the VE as

---

sit, stand since it's at a bench in each and every case the employer would have some say over that. I'm going to cut the employment figures by half right up front, [so] 8,000 in the local economy and 500,000 in the national economy[.] [A]nd one other I would offer this will come to three[,] [a] storage facility rental clerk, light work unskilled at a 2. The DOT is 295.367-026. The employment figures as published I believe are acceptable as stated due to the very nature of the job, it's sporadic, 7, 000 in the local economy and 440,000 in the national economy."); *compare id. with* Tr. 22-23 ("Dr. Sweeney testified that the numbers of jobs he listed represent a reduction, where applicable, in the total number of jobs existing in the state and national economies to include only those jobs that would permit a sit/stand option. Pursuant to Social Security Ruling 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles with the exception of the information []he provided regarding the sit/stand option. The option is not covered by the DOT, so Dr. Sweeney relied on his professional knowledge and experience in order to provide information regarding the existence of jobs that would accommodate a sit/stand option.").) Alternatively, therefore, this Court finds that the plaintiff has identified absolutely no error committed by the ALJ.

to any apparent conflicts, and did not err in relying on the VE's testimony to conclude that Plaintiff was capable of performing the positions. *See Cammon v. Astrue*, 2009 U.S. Dist. LEXIS 92293 (N.D. Ga. Oct. 2, 2009) (the ALJ did not err when she relied on the testimony of the VE where the ALJ had no reason to believe that there was any conflict between the VE testimony and the DOT and counsel did not question the VE about any alleged conflict).

*Id.* at *10; *cf. Zblewski v. Astrue*, 302 Fed.Appx. 488, 494 (7th Cir. Dec. 15, 2008) ("Because the   DOT does not address the subject of sit/stand options, it is not apparent that the [VE] testimony conflicts with the DOT. Moreover, even if the ALJ failed to comply with S.S.R. 00-4p, that failure was harmless because the ALJ was entitled to rely on other, unchallenged VE testimony. The VE testified that based on his experience, 2000 assembly jobs allowed a sit/stand at-will option. Zblewski did not challenge that assertion at his hearing, and an ALJ is entitled to rely on unchallenged VE testimony."). Finally, "[e]ven assuming that an inconsistency existed between the testimony of the vocational expert and the DOT, the ALJ did not err when, without first resolving the alleged conflict,[16] he relied on the testimony of the vocational expert[,]"inasmuch as Eleventh Circuit "precedent establishes that the testimony of a vocational expert 'trumps' an inconsistent provision of the DOT[.]" *Miller v. Commissioner of Social Security*, 246 Fed.Appx. 660, 662 (11th Cir. Aug. 31, 2007).

Beyond noting the foregoing, the undersigned would simply observe that Witherspoon's wholesale failure to establish her inability to perform the jobs identified by the vocational expert, *see Williams, supra,* 140 Fed.Appx. at 937—that is, unskilled light work as a hand packer/inspector, bench assembler, and storage facility rental

---

[16]      In *Miller*, the Eleventh Circuit specifically recognized that agency rulings, such as SSR 00-4p (requiring an ALJ to elicit a reasonable explanation for any apparent unresolved conflict between the testimony of the VE and the DOT), are not binding on courts. *See infra,* 246 Fed.Appx. at 662.

clerk—leads to the inexorable conclusion that the Commissioner's fifth-step denial of benefits is due to be affirmed.

## CONCLUSION

It is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 18th day of March, 2013.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**